The next case call for oral argument is Stolte v. Mission Care Services, LLC. Counsel, whenever you're ready, may proceed. Thank you. Good morning. Good morning. May I please have the floor? Good morning. This is an appeal from an interlocutory. It's an interlocutory appeal from a certified question. I represent the defendants in the case, Katelyn Kraft, Glenn Given, and Mission Care. Mission Care is an ambulance service that's licensed and certified by the Illinois Department of Public Health. And Katelyn Kraft and Glenn Given are both EMTs that are certified by the Department of Public Health. Could you speak just a little bit louder, please? I'll try. Thank you. The factual background in this case, it arose from a motion for summary judgment. It's important in deciding a certified question, so I'd like to spend a little bit of time reviewing that first. The decedent, Ronald Stolte, he died while he was being transported from St. John's Hospital in St. Louis County, Missouri, to his home in Redbud. He had previously been told by his doctors that he had two to six weeks to live because of his illness, and he decided to go home for hospice care instead of going into a nursing home. He also had a DNR order in place that limited what restitution could occur. Mission Care was called to transport Mr. Stolte from the hospital to his home in Redbud. Katelyn Kraft, at the beginning of her shift, checked the oxygen tank in the main ambulance and also with the portable oxygen tank. This is in accordance with her guidelines and protocols. When they proceeded to St. John's Hospital and they arrived there, they took the portable oxygen tank from the ambulance because they were told that Mr. Stolte required oxygen, and they took their stretcher up to his room. Once they were in his room, they started the portable oxygen tank, and they removed the tube from the wall in the hospital outlet for oxygen and plugged it into the portable tank and set it at the same setting. It was set at six. The gauge allows in the hospital and on the tank a .5 to a 15 setting, so this was at six, close to midway in the settings. The death occurred on the transport from the hospital back home, correct? Correct. Was that an emergency? It was not an emergency. But the Emergency Medical Act would still apply because they are EMS providers? Correct. Even on acting not in an emergency situation? The Immunity Provision Act specifically and expressly states that it applies to non-emergent and emergent care as long as they are licensed under the Act, and it's undisputed that they are. So when they got to the ambulance, they turned on the main oxygen, and then again they switched the tubing from the portable tank this time to the main oxygen in the ambulance. After he was positioned in the ambulance and they were en route, Mr. Stolte began to have some problems. Initially he had some nausea, and so the oxygen tank was rechecked and also to make sure it was operating properly, the main oxygen in the ambulance. And vital signs were taken. He continued to have problems and it progressed to where he was having difficulty breathing, the Kalen-Graf notice. She again rechecked the oxygen and it was operating properly. And then consulted with the driver, Glenn Given. He suggested maybe turning up the oxygen flow to an eight to see if that eliminated the problem. So she did turn up the oxygen rate to eight and proceeded. She again took some vital signs, and the next time she took vital signs, she was unable to get a pulse. So she increased the flow, but there was no oxygen flow because the connection didn't work. It was subsequently determined that the adapter that was connecting two pieces of tubing that were supplied by the hospital became dislodged. It could have turned their oxygen up as high as it would go and there still would be nothing flowing. Right. So wouldn't you want to check to make sure the oxygen is getting to the mass? Well, they did not know that there was an adapter in place. Normally there's just a single piece of tubing and it goes straight from the oxygen source to the nasal piece on the patient. In this particular case, the hospital spliced two pieces of tubing together and used an adapter to connect them. The undisputed testimony was that none of them knew that there was an adapter in place, and they were never trained to check for such an adapter, and that's why they did not do so. So following the protocols, they rechecked the oxygen source, and in addition to their protocols, they increased the oxygen flow when they realized that he was having difficulty breathing. The immunity provided by the Act applies, as the judge pointed out, to emergency and non-emergent situations. And the reason for the immunity is to make sure that emergency care is readily available and medical care is available even when circumstances are not ideal. In this case, Mr. Stolte was quite frail. In addition, he had a DNR, and so they were limited in what they could provide to him. The plaintiff's allegations in the complaint are set forth on pages 3 through 9 of the record. And the allegations of negligence, I'll just read them because they're very brief. Negligently and carelessly failed to properly equip the ambulance with the appropriate medical equipment and life-saving devices. And then they further allege that the defendants willfully and wantonly failed to administer care to the plaintiff while transporting him during a non-emergency transport by improperly connecting the plaintiff's nasal canula to an inoperative oxygen tank. As I indicated, we have filed a motion for summary judgment after depositions were taken of all of the occupants of the ambulance, contending that the facts do not indicate that there was willful and wanton misconduct on the part of Kaylin Craft and Glenn Given, and therefore the immunity applied under the Act. The circuit court denied our motion for summary judgment, but found that there were substantial grounds for differences of opinion and certified a question about whether or not the facts as developed in the summary judgment motion are sufficient to constitute willful and wanton acts. The standard of review here is de novo because no testimony was taken at trial and it is a certified question. And under Perlmire v. U.S. Bank, in addition to the certified question, this court also has the opportunity to look at the propriety of the order that was the reason for the certified question. And in this case, it was the denial of summary judgment. The EMS Act provides immunity. It provides immunity. It says all defendants are immune from civil liability except for willful and wanton misconduct. And I indicated earlier the purpose of immunity is to make sure that there is access to emergency medical providers, and also to make sure that they're not afraid of doing what they need to do under less than ideal circumstances. It's determining what is willful and wanton misconduct. One of the facts about who took the gentleman was in the hospital connected to some oxygen. Correct. Taken down to the ambulance. And then who connected the hospital's oxygen to the ambulance oxygen? Well, there was really three sources. First, there was the hospital's source of ambulance, which the hospital had already had him hooked up to. And when they came up with the stretcher, they brought a portable tank. They being who? That was Glenn Given. He handled that. So Kaylin Kraft was with him, but it was Glenn Given that actually operated the portable tank. He had set it on first initially set it on four to get it started, and then as soon as he connected the tubing from the hospital to the portable tank, he increased it to six just as it was in the hospital. And then they took him down to the ambulance, and once they were at the ambulance on the inside, they connected it to the main source oxygen in the ambulance and took him off his portable.  I assume the tubing was working while the gentleman was in the hospital. From the record, it's unclear. They don't know when it became disconnected. If it was earlier in the hospital when he was being transported or en route. The record's just not clear. The Illinois Supreme Court has defined willful and wanton misconduct as a course of action which shows actual or deliberate intention to cause harm or if not intentional, shows an utter indifference to or conscious disregard for the safety of others. In American National Bank v. City of Chicago, Illinois Supreme Court specifically looked at the EMS Act to determine what constitutes willful and wanton misconduct. And in that case, they held that a willful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others such as a failure after knowledge and impending danger to exercise ordinary care. Now, the cases have been split in determining what facts will constitute willful and wanton misconduct. And the cases generally fall into two categories. One where the emergency care providers follow the protocols and rules and generally in those cases, even though a tragic event occurs, they will not find willful and wanton as long as they adhere to their training and the guidelines that are applicable. But when they fail to follow the guidelines that are applicable, willful and wanton conduct has been found even if it was not intentional. For example, in American National Bank, in that case, there was a call by a patient saying she was having an asthma attack and was afraid she was going to die. She called 911. The ambulance was dispatched and went to her apartment and knocked on the door and there was no answer and they left. In that case, they found willful and wanton conduct by the 911 and the EMS workers. In that case, the 911 operator failed to follow protocol in not keeping the patient on the line. And also the EMS workers were found of willful and wanton conduct because they did not turn the doorknob, which was an unlocked door to enter, nor did they use destructive force to try to gain entry. So there they did not file protocol. And they did find willful and wanton conduct. But in cases where they have followed the guidelines, they have said that the acts that most amount to negligence and have not found an exception to the immunity. For example, in Bowdoin versus Cary Fire Protection District. In that case, it was also an asthma attack and the trial court granted summary judgment. The plaintiffs in that case alleged that the EMTs were negligent because they did not adequately secure the mask on the patient and also they stopped mouth-to-mouth resuscitation. But in that case, they said that they adhered to all the guidelines that were in place and approved, and therefore there was not willful and wanton conduct. Similarly, in Washington versus the city of Evanston, there was a call that a woman was in active labor and the physician at the hospital that was directing the EMTs did not direct them to go immediately to the hospital, but instead suggested that they rotate the baby and gently guide it out. Both the mother and the baby died, but since court found that they followed all procedures and guidelines, the activities did not constitute willful and wanton conduct. And finally, in Brock versus Anderson Road Association, this case may be one of the more similar ones because this one, although it was a motion to dismiss, it also involved the immunity provisions of the EMS Act. And here there was a worker that was working in the heat and humidity and suffered heat stroke. And in that case, the allegations against the EMT workers were that they did not know that the thermometer that they were using to gauge his temperature had a warning code and that this warning code meant that his temperature exceeded the scale of the thermometer. And it said that because they did not know about this malfunction or this aspect of the equipment, that they were willful and wanton. The court once again said, since they followed all protocols and provided care, that it was not willful and wanton conduct. But Brock was a 2615, which you acknowledge, but you cite American National to support your position, but that's also a 2615. Yes. So we have to take all well-pleaded facts as true. In the summary judgment. This was summary judgment. It was summary judgment. So the facts are construed in favor of the nominee. Right. But American National, you cite, was a 2615. Correct. Right. Okay. So, yes, some of the cases are slightly different. They came up on motions to dismiss. And in this case, I guess the disputed evidence was that the wife testified in her deposition that if Mr. Stolte was complaining that he wanted to sit up, that he was not getting enough air. And so the EMTs, Kaylin Craft and Glenn Gibbon, do not recall that statement being made. But even if that statement was, I think for these purposes, we have to assume that the purpose of the motion for summary judgment, that it was made. But even though that statement was made, attempts were made within the protocols to increase the oxygen flow and also to check the oxygen that was provided by the ambulance. Plaintiffs relied heavily on the Prowl versus Loretta Hospital case. It's a First District case. And in that case, the patient was being transported on a stretcher and the legs were not locked in place, and the patient fell and struck their head on the pavement. Now, in that case, we think it is different because the court focused on the fact that the EMTs noted that they knew that the legs were unlocked and then left the patient alone. So they knew the precise problem. Here, there's no indication, there's nothing in the record, that the EMTs knew anything about the adapter being present or that it had become dislodged. So that evidence simply is not present in our case. So we would ask the court to find that the facts are insufficient to establish what we want in conduct and go further and reverse the order denying a motion for summary judgment. Thank you. Thank you, counsel. Counsel? Your Honors, my name is Jim Williams. I represent the plaintiff in the underlying case. I argued the motion for summary judgment in this case going to Judge O'Malley. Judge O'Malley was correct in finding that this is local law misconduct and to allow me to go to trial to attempt to prove local law misconduct. That's what we're here about is do I get to go to trial in this case. The facts are pretty clear. And the defendant has given a pretty good recitation of facts, except for in the recitation she left out and later pointed out, that my client, Ms. Fulte, said to the ambulance personnel when he was acting in the seat, when he was acting in a certain way, meant that he wasn't getting oxygen. That's the statement. It's in my brief. It's in her deposition. Following that, the oxygen is turned up, and nobody makes an effort to determine if he really was receiving oxygen. Now, why is that willful and lawless conduct? And the reason is fairly clear, in my opinion. If you look at page 3 of the appellant's response brief, she cites a citation or a quotation from American National Antitrust Company versus City of Chicago. And basically that case says that once the ambulance drivers received notification of this impending danger or willful and lawless conduct, if the ambulance drivers received a notification of an impending danger, then they had to act with ordinary care. Once they know that this bad thing is about to happen, they have a responsibility to act. And that's what happened here. Once they were notified, once the wife said to the ambulance folks, and remember, she was riding along with her husband to take him home because he was dying, once she said to them, he's not getting oxygen because he's acting in this restless manner, they had an obligation, an affirmative obligation to check that tubing, which, by the way, wasn't their tubing. They adopted that tubing when they picked it up from the hospital. They went to the hospital knowing that my client needed oxygen. And when they arrived at the hospital, instead of using, they took an easier path, instead of putting new nasal cannula on him, they adopted the hospital's tubing. Now, that was their choice. It wasn't my client's choice. It wasn't a medical decision. Remember, this is a transport case. This is not my client's in an emergency situation. There was a discussion by the appellant about what makes these cases different. What's the common theme in the Wolfhound 1 cases in the ambulance area? Well, if you read the cases, if you read them over and over again, you'll find that most of the cases where the court says, no, we're not going to allow you to go to Wolfhound 1 with this set of facts, have to do with an ambulance responding to an emergency situation. That's generally the rule. If the ambulance is responding to some kind of medical emergency, the courts generally give them more leeway when they make a mistake. That's not this case. This case, admittedly, is covered by this same app. But this is purely a transport case. The ambulance personnel in this case received a notice on their palm-type device, the handheld device, that said, my client needed oxygen. They knew that when they arrived to pick him up. They had oxygen in the ambulance. They went up to get him with portable oxygen, so there's no question they knew he needed oxygen. There's also no question, absolutely, that the hospital had been providing him oxygen. The doctors told them that they needed oxygen, and they had received notification, I will say in writing, but notification electronically that he had to have oxygen. That was one of the provisions for him being transported. So they show up. They somehow decide to use this tubing, and then this tubing either becomes disconnected immediately or shortly after, and he receives no oxygen for the ride home. And about half, a little bit past half, he dies. Now, an interesting fact in this case, and one of the facts that I think Judge O'Malley took a particular interest in, was that as they're driving and my client tells them there's no oxygen, you need to get him oxygen, once he dies, and they get off to the side of the road to figure out what to do, my client goes back to the ambulance. As she's standing at the back of the ambulance, she can't hear oxygen flowing through the cannula. She says he's not receiving oxygen. At that point is when they finally figured out that there was no oxygen actually arriving at the delivery source at his nose. What was the time frame from that? Is there anything in the record that says how many minutes that was? I can't give you the exact time frame, but I know it was an extended period of time. I believe it was about seven minutes from when the wife told him that he needed the oxygen. And the reason I know that is because they weren't quite in Illinois yet, and they were headed to Redbud, and they were going on 255-270 south there across the JV Bridge. And when he finally died, they were already in Illinois getting ready for Route 3. I think that's about right as far as the time frame. We understand this is summary judgment, so you don't have all the facts. Right. But he was using this tubing at the hospital and getting oxygen. Correct. And then when he got in the ambulance, they connected that tubing to their tubing, and he didn't get oxygen. That's the bottom line there? That's the bottom line. That's what we believe happened. That's correct. And the bottom line is the wife knew him well enough, because he had suffered a long suffering with a lung condition. That's what was going to kill him, and that's the bottom line. He was dying. She knew him well enough to know that when he got restless in a certain manner, it's in my briefs and her testimony, that he wasn't getting his oxygen. And that's what she told the ambulance personnel. And that's why this rises to the level of wolf hormone misconduct. And that's why, in my opinion, the Powell case is important. I don't rely on it exclusively in my brief, but it is. In Powell, they knew that they didn't lock the gurney. Absolutely. Right. Here they didn't know that the oxygen wasn't flowing. They didn't know the exact mechanism, and I don't think they can make the argument that they don't know when they turn a blind eye to not doing what they need to do to know. Because it's almost ludicrous to think if a person with a nasal ganglion was sitting at my table, I believe that everyone in the room would know that oxygen was flowing because you'd hear that windy noise that comes out of the nasal ganglion. Now, how is it that my client was able to, in a matter of seconds, when she got to the back of the ambulance, determine that the decedent was not receiving oxygen because she couldn't hear the flow of the nasal ganglion? As the court pointed out earlier, Judge Wesson, you could turn the oxygen to 15 or 100. It didn't make any difference because the flow wasn't going to the nose, and that's the reason they couldn't hear it. That's the reason my client's wife, my client, couldn't hear it, is because the flow wasn't coming out of the nasal ganglion. So that's why, and I understand the distinction between Powell and Crowell, but I think it's a distinction without a difference, because the ambulance personnel, once they were told about this impending danger, had to do something, all right? And the fact that they made themselves ignorant of the danger doesn't solve their problem. Once they have knowledge of this impending danger, all the case law says, then they must act with ordinary care. And that's what gets me over the hurdle of a full-blown misconduct. That's why I believe Judge O'Malley is correct. I believe this court should find that Judge O'Malley and his decision was correct. Thank you, Your Honor. Thank you, Counsel. Counsel? Thank you. Just briefly, the EMS Act does expressly state that it applies to emergent and non-emergent transfers of patients, so I don't think there's really a dispute that it applies in this case. And there's not a different exception for non-emergent care versus emergent care. They both require willful and wanton conduct in order to avoid the immunity provided by the statute. Wyeth did testify in her deposition that when he says, when Mr. Stolte indicated that he wanted to sit up, that that generally means that he's not getting enough air. She did not say that he was not getting any air. She says he's not getting enough. That was her precise testimony. At that point, they rechecked the ambulance, and they also increased the oxygen flow. This case is different than Prowl because they did not have specific knowledge of what the problem was, as in that case where they knew that the legs were not locked on the stretcher. In addition, in Prowl, the court noted that even though they knew that the legs were not locked, they left the patient unattended. Here, they did not leave the patient unattended. They continued to monitor the vital signs. They continued to take steps to assure that oxygen was working in the ambulance and increase the flow. Here, simply, there is not the willful and wanton conduct as illustrated in the other cases. Here, they complied with all of their training and protocols and attended to the patient that does not support a willful and wanton conduct. We would ask the court to find that there is not sufficient access to establish willful and wanton, and also to reverse the denial of some of the judgments. Thank you. We appreciate the briefs and arguments of counsel. We will take this matter under advisement. The court will be in a short recess.